## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **SHANNON M.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | No. 18 C 7074 |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **ANDREW SAUL, Commissioner of** | ) | |
| **Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Shannon M. applied for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act ("Act"), 42 U.S.C. §§ 1381a, 1382c, in January of 2015. (Administrative Record (R.

171-77). She claimed that she became disabled as of December 30, 2011 (R. 171), due to a number

of complaints, including: fibromyalgia, myalgia myosis, hypothyroidism, GERD, hiatal "heredia

[sic]," anemia, asthma, allergies, insomnia, bipolar disorder, anxiety, and "arthritis – everywhere."

(R. 212). Her claim was denied at every level: initial, reconsideration, administrative law judge

(ALJ), and appeals council. It is the ALJ's decision, from September 8, 2017, that is before the court

for review. See 20 C.F.R. §§404.955; 404.981. Plaintiff filed suit under 42 U.S.C. § 405(g) on

October 22, 2017, and the parties consented to the jurisdiction of a Magistrate Judge pursuant to 28

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

U.S.C. § 636(c) on December 7, 2018. [Dkt. # 10]. The case was then reassigned to me after it was fully briefed, several months later, on August 22, 2019. [Dkt. #25]. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.

## FACTUAL BACKGROUND

## A.

Plaintiff was born on June 16, 1975, and so was just 36 years old when she claims she became unable to work ever again, and 42 at the time of the ALJ's decision. She worked only sporadically prior to that. She didn't work at all from age 21 through 25, age 29 through 34, or age 39 on. (R. 191-92). She used heroin regularly from age 35 through 39. (R. 560-61,708,720). In terms of whether she continues to use heroin or not, she's a completely unreliable historian. She's told her doctors her last use was in the fall of 2014, but she clearly continued to use the drug in early 2015 and the fall of 2015. (R. 464, 631). And at least one of her doctors indicated she continued using heroin into 2017. (R. 699, 704).

In terms of medical evidence, the record is large, spanning almost 400 pages. (R. 340-737). But, as is also usually the case, very little of it is significant in determining whether plaintiff can work or is disabled. Indeed, the plaintiff only points to about 20 pages of that evidence as supporting her claim for SSI. [Dkt. #20, at 11-15]. The medical record shows that plaintiff has, and has been treated for, fibromyalgia since at least 2013. (R. 521). But over the course of the medical record, findings are generally benign, and the examinations are normal. For example, at the first examination plaintiff points to in her brief in January 2013 [Dkt. # 20, at 2], plaintiff reported that

she was feeling well. (R. 505). Her treating physician, Dr. Adrian, noted no tenderness anywhere upon examination, no neurological symptoms, and no symptoms in plaintiff's extremities. (R. 506). In April 2013, Dr. Adrian again reported normal findings – no swelling, redness, or tenderness. (R. 521). The record goes on like this, with the vast majority of clinical findings reported as normal, without limitations, without tenderness, etc. (R. 340-42, 509-510, 513, 516, 518-19, 521, 525-26, 529-30, 533, 536, 539, 543-44, 547, 549-50, 624, 626-29, 631, 636-37, 640, 648-49, 711, 715-16, 721).

There are a few exceptions, of course, as few people feel great every day. But there is nothing significant enough to suggest disability. On March 29, 2010, plaintiff complained of back pain over the prior 5 days, although there was no tenderness upon examination. (R. 518-19). On May 1, 2013, Dr. Adrian noted moderate ankle tenderness, but normal strength, range of motion, and no swelling. (R. 526). On June 5, 2013, Dr. Adrian noted lower abdomen tenderness. (R. 536). Plaintiff reported constipation, heartburn and abdominal pain on July 17, 2013. (R. 543). On March 26, 2014, Dr. Adrian noted inflammation where plaintiff had last injected heroin. (R. 516). On May 1, 2014, there was tenderness from bruising on plaintiff's shoulder. (R. 530). Dr. Adrian reported tenderness to palpation along the cervical, thoracic, and lumbar spine, the clavicle, upper legs, and ankles on August 19, 2015. (R. 443). On July 12, 2016, there was moderate tenderness and decreased grip strength and range of motion in plaintiff's hands. (R. 640). There was tenderness along plaintiff's spine on December 14, 2016, and February 3, 2017, but range of motion and all other findings were normal. (R. 654, 716, 721).[2]

---

[2] Fibromyalgia is difficult to diagnose, and even more difficult for an ALJ to deal with in assessing a disability claim. Doctors formerly used certain trigger or tender points, nine pairs of locations throughout

(continued...)

Treatment records regarding plaintiff's mental status aren't much different, although they are fewer and farther between. Plaintiff went to the ER on October 28, 2014, after cutting her left forearm with scissors in response to an argument with her husband. (R. 357-58). She was transferred for psychiatric treatment (R. 581-82), where she was assessed with a GAF score of 45-50 upon admission and diagnosed with major depression before discharge on October 31st. (R. 584-85). There is no record of any further treatment until a year later in October 2015 (R. 440, 569), when she was admitted for symptoms of depression. (R. 569). Group therapy and counseling were offered at that time, but there is no record of plaintiff continuing with counseling. (R. 569). On November 25, 2015, Dr. Stanley Tomczyk noted that plaintiff was going to 12-step meetings, 3-4 times a week. (R. 628). Dr. Tomczyk prescribed Adderil for depression on December 23, 2015. (R. 626). Dr. Gaonkar, a psychiatrist, reported on April 4, 2017, that he had seen plaintiff every month since November 2015, but after November 15, 2015, there appear to be no notes of his treatment, and plaintiff does not direct the court to any. (R. 699); [Dkt. 320, at 2-8]. The single note

---

[2](...continued)

the body where palpation produced pain. https://www.mayoclinic.org/diseases-conditions/fibromyalgia/in-depth/fibromyalgia-symptoms/art-20045401.

Some of the tender points mentioned in Dr. Adrian's records were among those associated with fibromyalgia, and some, like those along the ankles and thoracic and lumbar spine, were not. https://www.mayoclinic.org/tender-points/img-20007586.

Under the former diagnostic technique, the "rule of thumb [was] that the patient must have at least 11" tender points. *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996). Clearly, plaintiff never demonstrated that many at any examination. More recently, doctors have looked for somewhat vaguer criteria: widespread pain lasting at least three months; presence of other symptoms such as fatigue, waking up tired and trouble thinking; no other underlying condition that might be causing the symptoms. https://www.mayoclinic.org/diseases-conditions /fibromyalgia/in-depth/fibromyalgia-symptoms/art-20045401. It's not clear what set of criteria Dr. Adrian was working with, but it is clear that, in the main, treatment records over the several years the doctor regularly saw plaintiff do not reveal findings of pain, tenderness, or accompanying limitations.

for November 15, 2015, consists solely of Dr. Gaonkar's assessment of plaintiff's GAF score as 45-50. So, there is no longitudinal record of plaintiff's psychological condition, symptoms, or limitations.

## B.

Following the administrative hearing – at which the plaintiff, represented by counsel, testified along with a vocational expert – the ALJ determined the plaintiff was not disabled. The ALJ found that the plaintiff had the following severe impairments: "fibromyalgia, spinal disorder, asthma, obesity, bipolar disorder and history of heroin and opiate abuse." (R. 18). The ALJ embarked on a lengthy summary of the medical evidence and determined that plaintiff's impairments, either singly or in combination, did not meet or equal a listed impairment assumed to be disabling in the Commissioner's listings. (R. 18-22).

The ALJ then determined that plaintiff could perform:

sedentary work . . . except . . . can never climb ladders, ropes or scaffolding. [Plaintiff] is to perform no more than occasional climbing of ramps/stairs, balancing, stooping, crouching, crawling, kneeling, bending or twisting. [Plaintiff] is to reach overhead no more than on a frequent basis with the right upper extremity, and should be allowed a sit-stand option allowing her to stand 1-2 minutes after sitting for 30 minutes. [Plaintiff] is to avoid concentrated exposure to lung irritants, cold temperature extremes, hot temperature extremes, and work hazards such as unprotected heights and dangerous moving machinery. [Plaintiff] should be allowed to use a cane as needed to get to/from the work station. [Plaintiff] is limited to understanding, remembering and carrying out no more than simple routine tasks performing the same tasks day in and day out. [Plaintiff] is to have no public contact for work-related purposes and no more than occasional contact with coworkers and supervisors. [Plaintiff] should not be required to travel to different work sites to complete job task(s) and should not have strict quotas (claimant should not perform work where someone checks up on her throughout workday to see if she is on pace with a goal/quota or with other employees) but she can perform work where performance is measured by what is completed by the end of the work day.

(R. 26-27).

In addition to the medical evidence, the ALJ considered plaintiff's subjective complaints about her symptoms and limitations. The ALJ said that she found that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms, however, the [plaintiff]'s statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for reasons explained in this decision." (R. 27). The ALJ compared plaintiff's allegations to the medical findings and noted they were not supported. The ALJ also noted some inconsistencies in plaintiff's statements to doctors and her allegations. The ALJ then went into depth regarding how her residual functional capacity finding accounted for each of plaintiff's limitations to the extent they were credible. (R. 22-28).

Next, the ALJ went through the medical opinion evidence. She gave no weight to the opinions of plaintiff's treating physician, Dr. Adrian, who opined that there was very little plaintiff was capable of doing and, in fact, she had to lie down for 30-40 minutes frequently throughout the day. (R. 24-25). She could only sit for 20-30 minutes at a time. (R. 25). But, as the ALJ explained, the doctor's treatment notes lent no support for such severe limitations, and that plaintiff's statements to Dr. Adrian, which appear to have formed the basis for Dr. Adrian's opinion, were not consistent with those she made to other doctors or elsewhere in the record. (R. 24-25).

Similarly, the ALJ rejected the opinion from Dr. Amdur, who examined plaintiff one time at her attorney's office. (R. 26, 559) The ALJ noted he was not a treating source, talked with the plaintiff on one occasion at her attorney's office, and had been a referral from plaintiff's attorney to provide support for plaintiff's claim for SSI. The ALJ again noted the inconsistencies between plaintiff's statements to doctors and statements she made elsewhere in the record. For example, she

lied to Dr. Amdur about when she last used heroin, telling him she quit in October of 2014 when she in fact had been using heroin daily a few months later in early 2015. (R. 464). As another example, Dr. Amdur said plaintiff couldn't travel alone but, in fact, she told the doctor she preferred traveling alone in her own car; her own space. (R. 26, 560). Finally, the ALJ also rejected the opinion of Dr. Gaonkar, a treating psychiatrist. The ALJ explained that the opinion was unsupported by any treatment record or notes. (R. 26-27).

Next, the ALJ – relying on the testimony of the vocational expert – found that plaintiff could perform the following jobs that exist in significant numbers in the national economy: final assembler (30,000 jobs); preparer (31,000 jobs); and sorter (25,000). (R. 29). Accordingly, the ALJ concluded that plaintiff was not disabled and was not entitled to benefits under the Act. (R. 32-33).

## II.

### STANDARDS GOVERNING REVIEW

If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). Substantial evidence is a "term of art" used throughout administrative law to describe how courts are to review agency fact finding. *T-Mobile South, LLC v. Roswell*, 574 U.S. ⸺, ⸺, 135 S.Ct. 808, 815 (2015). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). It is a low hurdle to negotiate. *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019).

To determine whether substantial evidence exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving

material conflicts, or reconsidering facts or the credibility of witnesses. *Beardsley*, 758 F.3d at 837. Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of that conflict. *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017); *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997).

But, in the Seventh Circuit, the ALJ also has an obligation to build what is called a "logical bridge" between the evidence and the result in order to afford the claimant meaningful judicial review of the administrative findings. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). *See also Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). Even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build the required "logical bridge." In that event, the court has said that it "cannot uphold a decision by an administrative agency..., if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet.* [3]

But, it cannot be too often repeated, the Seventh Circuit has called this requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir.

---

[3] Notwithstanding statements in *Sarchet*, review in a non-Social Security setting seems to be different. *See, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record, . . . ."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties, . . . No matter, because we may affirm on any basis that appears in the record.").

2008). Indeed, the court has said that "[i]f a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985). *See also Mogg v. Barnhart*, 199 F. App'x 572, 576 (7th Cir. 2006); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003).

## III.

## ARGUMENT

The plaintiff argues that the ALJ erred in rejecting three doctor's opinions and that, as a result, the ALJ's decision must be remanded. She contends that the ALJ had to give controlling weight to the opinions of Dr. Adrian and Dr. Gaonkar, and was wrong to accord little weight to the opinion of Dr. Amdur, a non-treating psychiatrist, who interviewed the plaintiff at the office of plaintiff's lawyer. [Dkt. #20, at 11-15; R. 26]. Plaintiff has no other problems with the ALJ's decision and so, any other arguments the plaintiff might have raised are deemed waived. *See Imse v. Berryhill*, 752 F.Appx. 358 (7th Cir. 2018); *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013); *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004).

## A.

Before addressing plaintiff's arguments, we note that, in her brief, plaintiff focuses, in the main, on *her* allegations, whether they be statements made at the hearing or to her doctors. As such, it is important to underscore that it is the plaintiff's burden to prove she is disabled with medical evidence. *See Prater v. Saul*, No. 19-2263, 2020 WL 219037, at *3 (7th Cir. Jan. 15, 2020)(plaintiff must cite evidence to show she needs a more restrictive RFC); *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010); *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008)("the claimant bears the risk

of uncertainty, . . . ."); *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004)("It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability."); 20 C.F.R. § 404.1512(c) ("You must provide medical evidence showing that you have an impairment and how severe it is during the time you say that you were disabled."). As the Supreme Court stressed in *Bowen v. Yuckert*, 482 U.S. 137, 146, n. 5 (1987), "[i]t is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so."

Statements to doctors do not become medical findings simply because doctors echo them in their treatment reports. *Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019), recognized that it is appropriate to reject doctors' opinions that merely parrot a plaintiff's complaints. Certainly, especially in the Seventh Circuit, *see, e.g., Carradine v. Barnhart*, 360 F.3d 751, 763-67 (7th Cir. 2004)(Coffey, J., dissenting), subjective complaints cannot be ignored or even lightly regarded. But, nevertheless, it remains incumbent upon a claimant for disability benefits to prove he is disabled with *medical evidence*. *Prater*, 2020 WL 219037, at \*3; *Castile*, 617 F.3d at 927; *Scheck*, 357 F.3d at 702; *Yuckert*, 482 U.S. at 146, n. 5. Yet, overall, the underlying tenor of Plaintiff's brief seems to be that mere allegations by a plaintiff win the day. Of course, they don't. "[U]nfortunately... saying so doesn't make it so...." *United States v. 5443 Suffield Terrace, Skokie, Ill.,* 607 F.3d 504, 510 (7th Cir.2010). Evidence, not partisan conclusions, is required. *Biestek v. Berryhill*, —— U.S. ——, 139 S. Ct. 1148, 1162 (2019).

Moreover, the fact that plaintiff's doctors may report that she is suffering from fibromyalgia or major depressive disorder, even if credited, does not decide the issue of whether she can work. Diagnosis does not equal disability. *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005); *Estok*

*v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998). For example, while "[s]ome people may have such a severe case of fibromyalgia as to be totally disabled from working . . . most do not . . . ." *Sarchet*, 78 F.3d at 307. *See also Hendricks v. Astrue*, 2009 WL 648610, at *9 (S.D. Ind. 2009)(Hamilton, C.J.). What matters is the severity of the condition and how it limits plaintiff's capacity to work, based on clinical and/or laboratory findings. As the court said in *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008): "it makes no difference if [plaintiff] saw [his doctor] 'every two-and-a-half months'. . . what does matter is that [his doctor] did not confirm the severity of [plaintiff's impairment] with medical examinations or tests." In the main, the record here only rarely mentions days where plaintiff demonstrated tenderness or other physical symptoms, and in terms of psychological symptoms, there is no ongoing record at all.

**B.**

An ALJ must decide the weight to be accorded even a treating physician's non-controlling opinion by considering, to the extent applicable, the treatment relationship's length, nature, and extent; the opinion's consistency with other evidence; the explanatory support for the opinion; and any speciality of the treating physician. *See* 20 CFR § 404.1527(c); *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). An ALJ is required to give "controlling weight" to a treating physician's medical opinion on the nature and severity of an impairment *if* it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) is "not inconsistent with other substantial evidence.*" Burmester v. Berryhill*, 920 F.3d 507, 512 (7th Cir. 2019); *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010). If an ALJ rejects a medical opinion, or gives it little weight, the ALJ must provide "good reasons" for doing so. *Walker v. Berryhill*, 900 F.3d 479, 485 (7th Cir. 2018). That's exactly what the ALJ did here.

The ALJ concluded and explained that Dr. Adrian's opinion was not supported by his treatment notes. (R. 24-25). That is a valid reason for discrediting a doctor's opinion. *Richison v. Astrue*, 462 F. App'x 622, 625 (7th Cir. 2012); *Burmester*, 920 F.3d at 512 (ALJ properly rejected "opinion [that[ was inconsistent with . . . [doctor's] own notes . . . ."); *Winsted*, 923 F.3d at 472 (ALJ properly rejected a doctor's opinion where it was contradicted by his treatment notes). And, as the opening discussion of the medical record amply demonstrates, everything the ALJ said about Dr. Adrian's notes is true. Actually, to merely say, as the ALJ did, that Dr. Adrian's treatment notes fail to support his dire assessment of plaintiff's capacity for activity is a severe understatement.

In August 2015, Dr. Adrian said plaintiff could stand only 1-2 hours and then would have to lie down for 30-40 minutes. In April 2017 the assessment was worse: she could stand for only 15-20 minutes and sit for only 20-30. She had to lie down 1-2 times a day. Dr. Adrian's opinion, essentially, portrayed plaintiff as what ALJs used to call a "dead claimant." *See Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Farley v. Berryhill*, 314 F. Supp. 3d 941, 948 (N.D. Ill. 2018); *West v. Colvin*, 2013 WL 3728807, at *14 (N.D. Ill. 2013). As the ALJ said, those severe restrictions are not supported – or even hinted at – in any of Dr. Adrian's treatment notes.

As detailed in the opening discussion, the record of Dr. Adrian's treatment consists largely, if not entirely, of normal exams and normal findings. There are no more than a smattering of abnormal findings, and not a single one of those suggest plaintiff cannot work, let alone that she can only sit for 30 minutes or stand for 15, or that she must lie down throughout the day. But, to lend even more credence to the ALJ's reasoning, Dr. Adrian attached to his opinion of plaintiff's severe limitations "all clinical findings and laboratory/test results" that support that opinion. (R. 705). But they clearly don't support it.

Here is a summary of *all* those notes: On April 14, 2017, plaintiff had no complaints and the examination – to the extent there was one – was normal. (R. 708-12). On February 23, 2017, Dr. Adrian noted "spinous processes are tender" and "multiple areas of muscular, soft tissue tenderness." Neurological exam was normal. Plaintiff's only musculoskeletal complaint was "morning stiffness." (R. 715-16). On December 14, 2016, there was no spinous or paraspinal tenderness, range of motion was normal. Neurological exam was normal. (R. 721). That's it as far as examinations go. Beyond that, plaintiff had blood work on February 2, 2017, and her thyroid was "a little elevated" and there was a "small elevated [sic] in [white blood cells]" (R. 724-31). Additional labs were "normal/negative" on April 17, 2017. (R. 732-34).

Nowhere in those essentially benign findings would one find anything about only being able to stand for 15 minutes before having to lie down. Where would one find anything to suggest plaintiff could only sit for 20 minutes? Plaintiff doesn't say, but she does point the court in the direction of a couple of other treatment notes from Dr. Adrian. It is, after all, her burden to do so. *See, e.g., Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 731 (7th Cir. 2014)(lawyers cannot expect judges to play archaeologist with the record); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Illinois*, 908 F.3d 290, 297 (7th Cir. 2018)("As has become 'axiomatic' in our Circuit, '[j]udges are not like pigs, hunting for truffles buried in' the record.'"); *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 537 (7th Cir. 1992)(". . . compelling the court to take up a burdensome and fruitless scavenger hunt . . . is a drain on its time and resources.").

One note is from August 19, 2015 [Dkt. # 20, at 12 (citing R. 440)], but it's neither clinical findings nor laboratory results. It's not a record of any examination. It's nothing more than Dr. Adrian recounting plaintiff's complaints that day. Plaintiff told the doctor her pain was worse with

"excess standing, excess sitting" and was alleviated by lying down. (R. 440). The other treatment note plaintiff refers to is from January 18, 2013 [Dkt. # 20, at 12 (citing R. 505)], and it is much the same. A cursory physical exam was unremarkable. (R. 506). That's all the plaintiff points to in the hopes of contradicting the ALJ's conclusion that Dr. Adrian's dire opinion was unsupported by his treatment notes. Clearly, that is not enough.

Dr. Adrian somehow went from those unremarkable findings to a medical opinion that plaintiff could not work because she could only sit for 20 minutes or stand for 15 before she *had* to lie down. Again, the doctor's examination results – gait, reflexes, strength, range of motion, etc. – were all repeatedly normal. Even in terms of muscle tenderness, mentions were sporadic and rare. Dr. Adrian's opinion, then, is simply not an acceptable medical opinion that the ALJ had to accord controlling, or any, weight. Dr. Adrian is the very definition of a doctor "bending over backwards," *Punzio v. Astrue*, 630 F.3d 704, 713 (7th Cir. 2011); *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir.2006), to support a patient's disability claim by uncritically accepting her every complaint. But as the court concluded in *Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019), a medical opinion is of no value where it is based largely on patient's subjective complaints. *Accord*, *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) ("... medical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints.").

Plaintiff also complains that the ALJ took issue with Dr. Adrian's report of plaintiff falling and his failure to restrict plaintiff from activities. [Dkt. # 20, at 11]. The ALJ did take issue with those points, and rightfully so. Dr. Adrian said plaintiff was unable to travel alone due to intermittent dizziness and falls. (R. 706). But, again, as the ALJ said, the record simply fails to support this

conclusion. (R. 25). There was no mention of dizziness and falls in the doctor's accompanying notes. (R. 708-37). Worse, plaintiff told Dr. Adrian she never fell between June and December of 2016. (R. 718). In her brief, plaintiff never manages to tell us where the support for Dr. Adrian's restriction might be found. [Dkt. #20, at 11-12]. As the Court of appeals has reminded counsel time and again, it is not the job of the court to scour the record to see if there might be support for a party's tendentious claim. *U.S. v. 5443 Suffield Terrace, Skokie, Ill.* 607 F.3d 504, 510 -511 (7th Cir.2010). *See also* cases at 13, *supra.*

And there is also Dr. Adrian's failure to place any restrictions on plaintiff's activities during any of her office visits. Plaintiff concedes the doctor never restricted her from any activities, but says that's because she wasn't working at the time. According to the plaintiff, "she was not at risk of causing herself damage of injury by engaging in more activity if she felt capable." [Dkt. #20, at 12]. But, wouldn't losing consciousness and falling intermittently – if that were actually the case – put her at risk of injury whether she was working or not? And, given the fact that Dr. Adrian felt plaintiff was capable of so very little activity, surely he would have mentioned something, at some point, before he was prompted to do so by her attorney. But he did not, and in this setting that silence is meaningful. *Compare Muhammad v. Oliver*, 547 F.3d 874, 877 (7th Cir. 2008)("[I]f there is an executed standstill agreement, one would expect an allegation to that effect. There is none. The complaint's silence is deafening.").

## C.

The plaintiff next argues that the ALJ was wrong not to accord controlling weight to the opinion from her psychiatrist, Dr. Gaonkar. Again, the ALJ properly took note that the doctor's opinion was not supported by treatment notes that plaintiff could not hold down a job. Unlike the

case of Dr. Adrian, who went from benign examination findings to an opinion of nearly complete incapacitation, Dr. Gaonkar made his huge leap to psychological disability from no treatment notes at all. The only indication in the record that the doctor ever saw plaintiff was his assessment at discharge from the hospital in October 2014. Indeed, that is the lone "treatment note" from the doctor that plaintiff cites in her brief. [Dkt. #20, at 13].[4] As such, one cannot possibly disagree with the ALJ's finding that Dr. Gaonkar's opinion is not supported by treatment notes. And, for the opinion to be accorded the weight of a treating physician's opinion, it had to have been. *See, e.g.*, *Rockwell v. Saul*, 781 Fed.Appx. 532, 538 (7th Cir. 2019)(". . . a treating physician must take care to provide and document only medical care and to steer clear of a patient's work-related restrictions . . . ."); *Loveless v. Colvin*, 810 F.3d 502, 507 (7th Cir. 2016)(ALJ properly discounted treating doctor's opinion as it was not supported by treatment notes).[5]

Seemingly aware of this flaw in her claim, plaintiff argues that Dr. Gaonkar's opinion is supported, not by any treatment notes from him, but by "consistent notes of bipolar disorder from Dr. Adrian." [Dkt. #20, at 13]. But these so-called "consistent" notes cover just three days in the course

---

[4] Even in her reply brief, after being challenged on the lack of support, plaintiff merely asserts that "Dr. Gaonkar had the experience of treating [plaintiff] and knowledge of his own records. As a busy, practicing psychiatrist, he was not required to include page citations in order for his opinion to be considered supported." [Dkt # 24, at 6]. But page citations wouldn't have helped because there are no treatment notes from the doctor. Through two rounds of briefing, plaintiff's counsel, busy or not, has failed to cite to any. And, unlike a "busy, practicing psychiatrist," an attorney, busy or not, is required to cite to evidence in support of her contentions. *See, e.g., Spitz*, 759 F.3d at 731; *Bunn*, 908 F.3d at 297; *Ehrhart*, 969 F.2d at 537 (". . . compelling the court to take up a burdensome and fruitless scavenger hunt . . . is a drain on its time and resources.").

[5] The only assessment of plaintiff in a treatment note from Dr. Gaonkar is the GAF score of 45-50 he assigned her on October 31, 2014. (R. 584). While that score was indicative of "serious symptoms ... or serious difficulty in social, occupational, or school functioning", *Aurand v. Colvin*, 654 F. App'x 831, 833 (7th Cir. 2016), that was nothing more than a snapshot of plaintiff's condition at that time. *See Punzio*, 630 F.3d at 710-11. Dr. Gaonkar authored his opinion that plaintiff was disabled *two and a half years later* and, it bears repeating, there is nothing from him in the interim.

of several years of Dr. Adrian's treatment. On August 19, 2015, Dr. Adrian noted plaintiff's "mood ha[d] been waxing and waning lately with some depression as well as functioning depression anxiety per her bipolar disorder" (R. 440), and noted her fibromyalgia might be affected by "fluctuations in her bipolar affective disorder and arthritis." (R. 444). On November 13, 2014, plaintiff reported to Dr. Adrian that she had increased anxiety over the prior three weeks with some depression but no suicidal thoughts. (R. 475). Finally, on February 1, 2016, Dr. Adrian noted plaintiff had a "long history of relatively well-controlled bipolar disorder" but found her mood "full" and her affect "appropriate." (R. 637). So, even assuming one could stretch the treating doctor rule to require an ALJ to accord controlling weight to an opinion from a doctor with no treatment record based on notes from a different doctor, Dr. Adrian's notes certainly don't bolster Dr. Gaonkar's findings, for example, that plaintiff would have to miss over a week of work each month (R. 704), or that she wouldn't be able to follow instructions, interact with others, or concentrate. (R. 702-03).

### D.

That leaves the opinion from Dr. Amdur. Plaintiff says that the ALJ erred in giving that opinion very little weight, and that it provides support for Dr. Gaonkar's opinion. After plaintiff's claim had been denied initially, plaintiff's attorney arranged for Dr. Amdur to have a one-hour session with plaintiff at the plaintiff's attorney's office on August 24, 2015. (R. 559). Dr. Amdur did not look at any of plaintiff's treatment records, whether from Dr. Adrian or from her hospital admission in October 2014. (R. 559). Dr. Amdur simply recounted plaintiff's report of experiencing depression since she was 4, cutting since she was 14, and having used heroin last in October 2014. (R. 560). According to him, she apparently said she wouldn't travel on public transit alone, because she wouldn't know the right train to take, and preferred traveling by car as it was her "own space." (R.

560).  Dr. Amdur's examination results based on this brief encounter were as follows:

> [Plaintiff] walked with a normal gait.  No bizarre or inappropriate behavior is observed.  Evidence of self-mutilation is noted on her forearms.  She is mildly obese.  Personal hygiene and grooming is [sic] satisfactory.  She sat calmly through the interview.  Her attention could be focused and she understood the questions put to her.  She was cooperative.  Speech was relevant and coherent.  Speech was fluent.  Rate of speech was normal.  The conversation was easily directed.  Affect was depressed.  There are no delusions or hallucinations.  Social withdrawal and social phobia are described.  Panic disorder with agoraphobia is prominent.  She does not travel independently.  Compulsive self-mutilation and obsessive thinking are described.  There is possible PTSD from adolescent abuse. [Plaintiff] cannot name the current Mayor.  She correctly named the current President and three additional past Presidents.  She correctly names two recent events and five big cities.  She slowly spelled "world" forwards but could not spell it backwards.  She correctly named the 12 months of the year in order. The Montreal Cognitive Assessment was administered . . . . She attained a score of 21 out of 30.  Her score indicates mild or moderate cognitive impairment.  She had very poor calculation skills.

(R. 562).

Essentially, Dr. Amdur said that: (1) plaintiff presented with a depressed affect; (2) she did not know the current mayor (perhaps of Chicago, but plaintiff lives in Aurora, so this was unclear); (3) she could not spell "world" backwards; (4) she was poor at math.  He noted she had cut her forearm (or had remnants of needle marks, it was unclear).  All other observations were normal.  The doctor accepted plaintiff's claims that she was withdrawn socially and did not travel independently.  He noted, at the outset, that he considered plaintiff to be "a reliable historian."  (R. 559). Why, he did not pause to explain.   From these observations, Dr. Amdur reached several conclusions about plaintiff's ability to work.  He said that plaintiff's:

> [d]epressive withdrawal would interfere [with] her ability to initiate and persist at tasks.  Panic and agoraphobia completely prevent her from traveling independently to any work site.  Anxiety and panic would undermine her capacity to tolerate work stress. Obsessive thinking would make it difficult for her to follow instructions and ask for assistance and guidance.

(R. 563).

18

The ALJ considered the doctor's opinion, concluded it was entitled to very little weight, and gave a number of cogent reasons for this conclusion. (R. 26). Of course, it is indisputable that the ALJ does not have to accord weight even to an examining doctor's opinion, as long as the ALJ provides good reasons for not doing so. *Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019); *Hawkins v. First Union Corporation Long-Term Disability Plan,* 326 F.3d 914, 916-917 (7th Cir. 2003).

As the ALJ explained, Dr. Amdur was a one-time examiner and not a treating source. That, as case after case tells us, is a legitimate factor that detracts from the weight of an opinion. *Winsted*, 923 F.3d at 478. Next, the ALJ wondered about the doctor's impartiality as he was hired by plaintiff's attorney and talked with plaintiff at counsel's law office. Plaintiff takes umbrage at this rather commonsensical observation in her brief, arguing that there is no other way for a claimant to establish her limitations and says that the ALJ didn't question the bias of the experts employed by Social Security. [Dkt. #20, at 14]. Plaintiff directs the court to the Seventh Circuit's ruling in *Moss v. Astrue*, 555 F.3d 556 (7th Cir. 2009), for the proposition that an ALJ may not question the reliability of a doctor's opinion merely because it was provided at the request of counsel. [Dkt. #20, at 14].

But, as this discussion is highlighting, the ALJ provided more than just one reason for according Dr. Amdur's opinion little or no weight. In *Moss v. Astrue*, 555 F.3d 556 (7th Cir. 2009), the *only* reason the ALJ provided for rejecting the opinion of a *treating physician* was *speculation* that the plaintiff had been referred to the physician by her attorney. 555 F.3d at 560-61. Here, there was no *speculation* about the referral and Dr. Amdur never treated the plaintiff, seeing her once for an hour in counsel's law office. Moreover, while the *Moss* court went on to question whether an attorney referral could ever be a legitimate basis for questioning a physician's report, 555 F.3d at 561, on

other occasions the Seventh Circuit has acknowledged the potential for certain doctors to be biased in favor of patient's applications for benefits.

The court has repeatedly observed that physicians may "bend over backwards" to assist a patient in obtaining benefits or do a favor for a friend. *Punzio v. Astrue*, 630 F.3d 704, 713 (7th Cir. 2011); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir.2006); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). The court has also noted that there are certain physicians most likely to attract patients who are thinking of seeking disability benefits who can bring similar bias to their opinions. *Hofslien*, 439 F.3d at 377. The law firm representing plaintiff regularly refers claimants to Dr. Amdur, *see, e.g., Rose v. Berryhill*, 2018 WL 6590561, at *1 (N.D. Ill. Dec. 14, 2018); *Reynolds v. Berryhill*, 2018 WL 6327004, at *2 (N.D. Ill. Dec. 4, 2018); *Jones v. Berryhill*, 2018 WL 4905020, at *3 (N.D. Ill. Oct. 9, 2018); *Keating v. Berryhill*, 2018 WL 4088063, at *4 (N.D. Ill. Aug. 27, 2018); *Lugo v. Colvin*, 2014 WL 3687235, at *17 (N.D. Ind. July 23, 2014), so perhaps he fills that bill, perhaps not. In any event, as already noted, Dr. Amdur's provenance was not the sole reason the ALJ provided for discounting his opinion. As such, we cannot say that it was wrong for the ALJ to note the fact that plaintiff's counsel arranged for the meeting at her office.[6] Here, the ALJ's express concern had nothing to do with the

---

[6] Even outside the Social Security context, the court has long acknowledged that the expert can be swayed by bias of the party paying the fee. *See, e.g., Tyus v. Urban Search Mgmt*., 102 F.3d 256, 263 (7th Cir. 1996)("In all cases, however, the district court must ensure that it is dealing with an expert, not just a hired gun."); *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 382 (7th Cir. 1986)("[E]xpert witnesses . . . are often the mere paid advocates or partisans of those who employ and pay them, as much as are the attorneys who conduct the suit. There is hardly anything, not palpably absurd on its face, that cannot now be proved by some so-called 'experts.'"); *Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997)("[The expert witness in this case" exemplifies everything that is bad about expert witnesses in litigation. It is full of vigorous assertion . . ., carefully tailored to support plaintiffs' position but devoid of analysis."). And of course, such observations are not limited to the Seventh Circuit. *See, e.g.,* Jack Weinstein, *Improving Expert Testimony,* 20 U.Rich.L.Rev. 473, 482 (1986) ("an expert can be found to
(continued...)

"speculation" – the term employed by *Moss* to describe what the ALJ did in that case – that the lawyer had referred the case to the examining doctor.

Neither *Moss* nor any other case holds that the issue of potential bias in a witness is not a relevant consideration merely because the witness is a doctor or the trial is a Social Security proceeding. Nor could it, for the issue of bias is always relevant. *United States v. Abel*, 469 U.S. 45, 52 (1984); *Davis v. Alaska,* 415 U.S. 308, 316 (1974); *United States v. Jamison*, 671 F.3d 167, 176 (7th Cir. 2011); *United States v. Vasquez*, 635 F.3d 889, 900 (7th Cir. 2011); *United States v. Henderson*, 337 F.3d 914 (7th Cir. 2003). Bias refers to that which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party. *Abel*, *supra*; *United States v. Martin,* 618 F.3d at 727. The finder of fact and weigher of credibility– be it judge or jury – has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony. *United States v. Abel,* 469 U.S. 45, 51 (1984); J. Strong, McCormick on Evidence, § 33, at 111-12, and § 39, at 130-34 (4th ed.1992). Or as Wigmore put it, the range of circumstances from which bias may be inferred is "infinite." IIIA Wigmore on Evidence, §949 at 984; §950 at 793 (Chadbourn rev. 1970).

These basic principles are as applicable in Social Security or Administrative Law cases as in any other setting. and *Moss* did not pretend to hold otherwise. *Cf., Sullivan v. Colvin*, 588 F. App'x

---

[6](...continued)
testify to the truth to almost any factual theory, no matter how frivolous."); Michael H. Graham, *Expert Witness Testimony and the Federal Rules of Evidence: Insuring Assurance of Trustworthiness* (1986) Ill.L.Rev. 43, 45; 29 ("Today practicing lawyers can locate quickly and easily an expert witness to advocate nearly anything the lawyers desire."); Huber, *Safety and the Second Best: The Hazards of Public Risk Management in the Courts,* 85 Colum.L.Rev. 277, 333 (1985) ("A Ph.D. can be found to swear to almost any expert proposition no matter how false or foolish."). The ALJ certainly cannot be faulted for expressing this same type of commonsense observation, albeit in not so harsh a tone.

725, 726 (9th Cir. 2014)("substantial evidence supported the ALJ's rejection of the lay witness testimony for bias...."); *Garcia v. Colvin*, 741 F.3d 758 (7th Cir. 2013); *Edwards v. Sullivan*, 985 F.2d 334, 337 (7th Cir. 1993)("the ALJ has the ability, as the trier of fact, to consider the physician's possible bias."). It is because the ALJ can see and hear witnesses that he or she is in the best position to make credibility findings and to determine bias or prejudice. *Shideler v. Astrue*, 688 F.3d 306, 310-311 (7th Cir. 2012); *W. Watersheds Project v. U.S. Dep't of Interior*, 2009 WL 5218020, at *14 (D. Idaho 2009). A psychiatrist's willingness to examine a party to a suit at her lawyer's office is a circumstance that can bear on possible partiality of the witness.

It bears repeating, *Moss* did not question these basic principles; it merely concluded that the testimony of a treating doctor was not to be rejected simply because of the ALJ's speculation that the doctor had been referred by the plaintiff's counsel. More important for this case was *Moss's* emphasis on the fact that in making credibility judgments, the ALJ "altogether failed to address whether Dr. Kodros's medical opinions [were] supported by medically acceptable clinic and laboratory diagnostic techniques." That glaring omission was not present here; quite the contrary. Here is a relevant portion of the ALJ's quite lengthy Opinion:

> Very little weight is given to [Dr. Amdur's] opinion as the doctor is not a treating source. Rather, he was hired by the attorney to evaluate the claimant after the consultative examination at Exhibit 4F. The examination was performed in the attorney's office (Exhibit 9F/1) so [his] impartiality is questionable. As noted above in the part B criteria, many things the claimant told this doctor are contradicted elsewhere. This includes her claims of when she last used heroin (she told the doctor she has not used heroin since October 2014, however it was noted at Exhibit 7F/32 dated July 19, 2015, that she was inhaling heroin for about two weeks daily and quit about a week before). Claimant also used heroin after she saw Dr. Amdur according to Exhibit 16F/12. Dr. Amdur's opinion is not supported by the objective medical record including his own observations. There is no evidence of panic attack at the examination and no evidence of anxiety/stress that claimant is unable to focus and remain on task for the examination. The doctor indicated that the claimant cannot

travel alone but the claimant reported she can drive alone at Exhibit 9F/2. She is also seen as being responsible for welfare of her child who spends time with her.

(R.26).

In short, the ALJ's assessment of Dr. Amdur's opinion *was not* based on the concern that troubled *Moss*. Rather, it was based on a careful assessment of the evidence and the applicable regulations. The conclusion that Dr. Amdur's opinion was not supported by medically acceptable clinical and laboratory diagnostic techniques and evidence is beyond debate, and the correctness of that conclusion had nothing to do with the place of the interview. In short, the ALJ in this case did not run afoul of the principle that "'[t]he mere fact that a medical report is provided at the request of counsel or more broadly, the purpose for which an opinion is provided is not a legitimate basis for evaluating the reliability of the report.'" *Goyco v. Colvin*, 2014 WL 5152570 at \*5 (N.D.Ill. 2014).

The ALJ's opinion makes clear that the weight he gave Dr. Amdur's testimony would have been the same regardless of where his brief interview with the plaintiff occurred. In other words, the ALJ's conclusions about Dr. Amdur's opinion would have been the same had the interview occurred at his rather than the plaintiff's lawyer's office. Therefore the ALJ's concerns about possible bias based on the locus of the examination, even if error, was harmless, and a harmless error analysis applies in the context of a Social Security case. *See Egly v. Berryhill*, 746 F. App'x 550, 555 (7th Cir. 2018); *Alvarado v. Colvin*, 836 F.3d 744, 751 (7th Cir. 2016).

### E.

Finally, the ALJ indicated that, contrary to Dr. Amdur's assessment, plaintiff was not, in fact, a reliable historian. (R. 26). As the ALJ noted, plaintiff lied to Dr. Amdur about her last heroin use, but Dr. Amdur accepted her claim that it had been October 2014. (R. 26, 560). The ALJ further

noted that plaintiff testified that the reason she didn't drive was because she no longer had a car (R. 19, 26, 50), not because, as she told Dr. Amdur or as he interpreted, she was unable to travel due to agoraphobia. (R. 563). The ALJ also noted that, according to plaintiff's mother, plaintiff's lack of social interaction was due to pain and not any depression or withdrawal, contrary to what plaintiff apparently told Dr. Amdur. (R. 20, 562). There were other examples as well.

Ordinarily, an ALJ may properly reject a doctor's opinion if it is based on a claimant's subjective complaints. *Ghiselli v. Colvin*, 837 F.3d 771, 776 (7th Cir. 2016); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008); *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005). In the case of a psychiatrist or psychologist, however, patients' self-reports often form the basis for psychological assessments. *Price v. Colvin*, 794 F.3d 836, 840 (7th Cir. 2015). Still, even in such cases, the doctor can be too uncritical. *See, e.g., Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019)(ALJ properly rejected opinion from psychologist as it "largely reflected [plaintiff's] subjective reporting."). That certainly seems to have been the case here. While mental-health assessments normally are based on what the patient says, the doctor must assess those complaints through the objective lens of his professional expertise. *Mischler v. Berryhill*, 766 F. App'x 369, 375 (7th Cir. 2019). Here, however, Dr. Amdur decided plaintiff was a reliable historian when she wasn't and, as a result, the doctor's opinion in a number of respects rests on shaky ground. Had Dr. Amdur reviewed the medical evidence and had it to compared against what plaintiff told him, as the state agency doctors did, he might have picked up on the unreliability of plaintiff's accounts. (R. 69-70, 72). But he did not. (R. 559). The ALJ's decision, and explanation, for assigning Dr. Amdur's opinion little or no weight was clearly not "patently erroneous." *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015).

## CONCLUSION

Once a claimant's claim has been denied multiple times at the administrative level, the court's review is limited to determining whether the ALJ's decision is supported by substantial evidence. *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019). "[W]hatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high." *Id.* Indeed, the Supreme Court has likened it to the clearly erroneous standard. *Dickinson v. Zurko*, 527 U.S. 150, 162–63 (1999). And in order for a decision to be overturned under that standard, the Seventh Circuit has said it must "strike [the reviewing court] as wrong with the force of a five-week-old, unrefrigerated dead fish." *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988); *see also Cent. Mfg., Inc. v. Brett*, 492 F.3d 876, 883 (7th Cir. 2007). That's obviously not the case here.

Here, the ALJ had a medical record before her made up of physical exam after physical exam noting normal or unremarkable findings. In the main, range of motion and strength were normal; in the main there was no tenderness to palpation, although there were a few exceptions. The record of psychiatrist treatment before the ALJ was essentially non-existent; there were no treatment notes from her treating psychiatrist. There were three medical opinions – two from treating doctors, one from a consulting psychiatrist who saw plaintiff at her attorney's office – saying that plaintiff was disabled but, obviously, they were unsupported by the medical evidence. Given all this, the ALJ's conclusion that the plaintiff was not disabled would pass muster under a stricter standard than substantial evidence. The ALJ's decision is affirmed.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 1/17/20